UNITED STATES of America, Plaintiff,

v.

Nancy McCOMBS–ELLISON, Jon Ellison, Columbia Banking Saving & Loan Association, Robert J. McCombs, State of New York, Kelly M. McCombs and Mary McCombs, Defendants.

No. 87–CV–1475L.

United States District Court, W.D. New York.

March 29, 1993.

Order Vacating Opinion in Part April 22, 1993.

Decision on Motion to Amend June 21, 1993.

Andrew Pleplar, Tax Atty. U.S. Dept. of Justice, Washington, DC, for plaintiff.

Arnold Petralia, Appeal Atty., Rochester, NY, for defendants.

Michael J. Mazzullo, Rochester, NY, for Nancy McCombs–Ellison and Robert McCombs.

Christopher S. Ciaccio, Rochester, NY, for Kelly McCombs and Mary McCombs.

Peter A. Sparagna, Office of New York State Atty. Gen., Dept. of Law, Albany, NY, for State of N.Y.

## AMENDED VERDICT and OPINION

FISHER, United States Magistrate Judge.

### I. *Background*

The complaint in this action was filed on November 24, 1987, by the United States of America against Nancy McCombs–Ellison, Jon Ellison, Columbia Banking Saving & Loan Association ("Columbia Banking"),

Robert J. McCombs, State of New York, Kelly M. McCombs and Mary McCombs.[1] The United States asks the court to:

(1) Declare the federal tax liens assessed against all property and rights to property of defendant Nancy McCombs–Ellison valid;

(2) Enter judgment for the plaintiff against defendant Nancy McCombs–Ellison in the amount of $30,035.07 plus interest from the date of assessment;

(3) Set aside a transfer to defendants Kelly and Mary McCombs of property located at 74 Meadow Creek Lane, Rochester, New York, as fraudulent.

(4) Order that the federal tax liens on the property, located at 74 Meadow Creek Lane, Rochester, New York, be foreclosed and the property sold free and clear of titles, liens, claims or interests of any defendants.

This matter was tried before me on March 19, 1992, pursuant to 28 U.S.C. § 636(c) upon consent of the parties and by order of District Court Judge David G. Larimer, dated February 28, 1992. Immediately prior to trial, the government filed a trial brief with the court on March 17, 1992, in which it set forth its position in the case.

At trial, the government, relying on the arguments presented in its brief, argued that the filing of the assessments established a *prima facie* finding of liability on the part of the defendants because of the presumption of correctness of the assessments. The government then argued that

[a]s a tax assessment is presumed to be correct, a taxpayer who has been assessed under [26 U.S.C.] Section 6672 is presumed to be both "responsible" and "willful" and has the burden of proving, by a preponderance of the evidence, that she does not owe the tax claimed by the government.

Government's Trial Brief, pp. 3–4. The government further argued that a lien in the amount of $26,925.79 was created on June 14, 1982, the date of assessment, which lien immediately attached to the property located at 74 Meadow Creek Lane, then owned by Ms. McCombs–Ellison. A Certificate of Assessment and Penalty was filed in the Monroe County Clerk's Office on September 22, 1982.

The government further argued that the facts also established a presumption of insolvency, a presumption which established *prima facie* that Ms. McCombs–Ellison fraudulently conveyed the 74 Meadow Creek Lane property to her daughters, Kelly and Mary McCombs, on September 15, 1982. In its case-in-chief, the government introduced 23 documents into evidence. After the first 22 of these exhibits were admitted into evidence, the government rested without presenting any witnesses.[2]

Defendants Ms. McCombs–Ellison and Robert McCombs immediately moved for summary judgment on the basis that the government failed to establish a *prima facie* case of liability on the part of the defendants. Defendants Kelly and Mary McCombs moved to dismiss the complaint, on the grounds that the government failed to prove all the elements necessary to establish a *prima facie* case of fraudulent conveyance.[3] For the reasons set forth below, these motions are denied.

The following is my opinion and memorandum of decision finding the facts specifically in accordance with Fed.R.Civ.P. 52(a).

## II. *Findings of Fact*

### A. Spinnaker Pole Corporation and Port and Starboard

The Spinnaker Pole Corporation ("Spinnaker Pole") was incorporated in May, 1979, by

---

**1.** "All persons having liens upon or claiming any interest in the property involved in such action [brought pursuant to 26 U.S.C. § 7403(a)] shall be made parties thereto." 26 U.S.C. 7403(b).

It should be noted that Jon Ellison is no longer a defendant. Further, all parties concede that Columbia Banking is no longer a defendant, its lien having been fully satisfied.

**2.** The defendants did not object to the admission of the documents into evidence, but they sought

to reserve a right to impeach the validity of the documents' contents through cross-examination of the witnesses who prepared the documents. Transcript of Trial Proceedings, March 19, 1992, at pp. 6–7 ("Transcript"). Because the government called no witnesses at trial, defendants were unable to exercise this right.

**3.** These arguments were joined by defendants Ms. McCombs–Ellison and Robert McCombs.

Nancy McCombs–Ellison and Jon Ellison. Ms. McCombs–Ellison acted as President of the corporation, and owned 60% of the stock. Jon Ellison owned 40% of the stock.

Ms. McCombs–Ellison and Mr. Ellison were also partners of an entity called "The Port and Starboard," ("Port and "Starboard") of which they held 60% and 40% interests, respectively. On May 14, 1979, Port and Starboard purchased the Edgewater Restaurant ("Edgewater") for $235,-000.00. To pay for the restaurant, Port and Starboard gave Edgewater a mortgage in the amount of $185,000.00. Ms. McCombs–Ellison supplied the remaining $50,000.00 by taking out a mortgage for that amount on her house at 74 Meadow Creek Lane, Rochester, New York. Transcript of Trial Proceedings, March 19, 1992, at p. 35, lines 23–28 ("Transcript"). The restaurant was then leased to and operated by Spinnaker Pole, for a monthly rental payment of $2,724.75 to Port and Starboard. Government Exhibit 18, ¶ 17.

Business at the Edgewater did well for a while. There came a time, however, when Port and Starboard was unable to make its monthly mortgage payments to Edgewater. Edgewater filed a foreclosure action against Port and Starboard on April 10, 1981. Government Exhibit 6. Port and Starboard then filed for bankruptcy under Chapter 11 on April 24, 1981. Government Exhibit 7, Complaint, ¶ 1. Spinnaker Pole also filed for bankruptcy in September, 1981.

It is undisputed among the parties that Spinnaker Pole

incurred federal withholding and unemployment tax liabilities for the tax periods beginning October 1, 1979 through September 30, 1981 in the amount of $26,-925.79 which were assessed on June 14, 1982. A Federal Tax Lien for these assessed liabilities was filed in the Monroe County Clerk's Office on September 22, 1982. Spinnaker Pole incurred additional federal withholding and unemployment tax liabilities for the tax periods beginning October 1, 1981 through June 30, 1982 in the amount of $3,091.28 which were assessed on April 16, 1984. A Federal Tax Lien for these assessed liabilities was filed in the

Monroe County Clerk's Office on June 21, 1984.

Government's Trial Brief, pp. 1–2.

The government now seeks to reduce these liens, totalling $30,035.07, to judgment and foreclose them against property previously owned by Ms. McCombs–Ellison, located at 74 Meadow Creek Lane, Rochester, New York.

### B. 74 Meadow Creek Lane, Rochester, New York

The property at 74 Meadow Creek Lane was originally purchased by Robert J. McCombs and his former wife, Ms. McCombs–Ellison, on February 16, 1962. The McCombs financed the property by giving a $30,000.00 mortgage to Columbia Banking, Saving and Loan Association. After the McCombs' divorced, Mr. McCombs conveyed his interest in the property to Ms. McCombs–Ellison by quit claim deed dated May 5, 1978. On September 15, 1982, Ms. McCombs–Ellison conveyed the property to her daughters, Kelly M. McCombs and Mary McCombs, by warranty deed, which was recorded in the Monroe County Clerk's Office on September 16, 1982. As consideration for the property, the daughters agreed to assume the unpaid principal remaining on the mortgage loan to Columbia Banking in the amount of $10,469.29. They also took the property subject to the remainder of Ms. McCombs–Ellison's $50,000.00 Marine Midland Bank mortgage, which was then $47,-328.65. No other consideration is recited in the deed. On January 18, 1985, Kelly and Mary McCombs obtained a $53,000.00 mortgage on the 74 Meadow Creek Lane property from their father, Robert J. McCombs. This mortgage was recorded in the Monroe County Clerk's Office on January 24, 1985.

### III. Conclusions of Law

#### A. Jurisdiction

This court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

§§ 1340 [4] and 1345,[5] and 26 U.S.C. § 7402(a).[6] This action was properly commenced by the United States pursuant to 26 U.S.C. § 7401 [7] and 7403(a).[8]

## B. One Hundred Percent Penalty Assessment (26 U.S.C. § 6672)

The Internal Revenue Code (26 U.S.C.) requires employers to deduct, withhold and pay over to the federal government, federal income and social security taxes from their employees' wages. 26 U.S.C. §§ 3402(1) & 3102(a); *Carter v. United States*, 717 F.Supp. 188, 190 (S.D.N.Y.1989). The amounts so withheld from the employees' paychecks "are held by the employers as a special trust fund for the benefit of the United States ..." *Id.*, 717 F.Supp. at 191; 26 U.S.C. § 7501(a).[9] The withheld amounts are commonly referred to as "trust fund taxes," *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978), and the trust is created "at the moment the relevant payments" to the employees are made. *Begier v. I.R.S.*, 496 U.S. 53, 60, 110 S.Ct. 2258, 2264, 110 L.Ed.2d 46 (1990). "As the employer withholds taxes from employees' wages a contingent liability is created," which liability "becomes fixed on the due date."

4. "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, ..." 28 U.S.C. § 1340.

5. Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Congress. 28 U.S.C. § 1345.

6. The district courts of the United States at the instance of the United States shall have such jurisdiction to ... render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. 26 U.S.C. § 7402(a).

7. No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action by commenced. 26 U.S.C. § 7401; *see* Complaint ¶ 2.

8. In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy

*Kalb v. United States*, 505 F.2d 506, 509 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975).

"Should employers fail to pay trust fund taxes, the government may collect an equivalent sum directly from the officers or employees of the employer who are responsible for collecting the tax." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 547, 110 S.Ct. 2139, 2141, 109 L.Ed.2d 580 (1990); 26 U.S.C. § 6672.[10] A penalty imposed pursuant to 26 U.S.C. § 6672 "is itself referred to as a 'tax' in Section 6671." *Mazo v. United States*, 591 F.2d 1151, 1153 (5th Cir.1979), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); 26 U.S.C. § 6671(a). *See Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.1970), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970) ("Despite its denomination as a 'penalty' assessment, the statutory liability imposed by Section 6672 is essentially civil in nature"); *Kalb v. United States*, 505 F.2d at 510 (same).

■ A tax assessment, made pursuant to § 6672, is presumed correct. *Curley v. United States*, 791 F.Supp. 52, 56 (E.D.N.Y.1992). The assessment thus "creates a *prima facie* case of liability." *Carter v. United States*,

has been made, the Attorney General or his delegate, at the request of the Secretary, may direct a civil action to be filed in a district court of the United States to enforce a lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability. 26 U.S.C. § 7403(a).

9. Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States.... 26 U.S.C. § 7501(a).

10. Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof, *shall in addition to other penalties provided for by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.* 26 U.S.C. § 6672 (emphasis supplied).

717 F.Supp. at 191; *Schwinger v. United States*, 652 F.Supp. 464, 466 (E.D.N.Y.1987). Because "a Certificate [of Assessment] is presumptive proof of a valid assessment," *United States v. Red Stripe, Inc.*, 792 F.Supp. 1338, 1341 (E.D.N.Y.1992), the government met its burden of proof at trial on the issue of liability by presenting the Certificates of Assessment for introduction into evidence as Government Exhibit 1.

■ "[T]his presumption can be overcome by destroying the assessment's foundation," *Curley v. United States*, 791 F.Supp. at 54, and "the taxpayer bears both the burden of production and the burden of persuasion in showing that the presumption is unwarranted." *United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir.1990). Although, "[i]n general, courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment," *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir.1987), the taxpayer may overcome the presumption of correctness and show "that an assessment is utterly without foundation," by coming forward with proof that the assessment is "arbitrary and erroneous." *United States v. Janis*, 428 U.S. 433, 442, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976). Because defendants never questioned the validity of the assessments, nor did they introduce any documentary or testimonial evidence to that effect, I find that the presumption of correctness of the assessment applies and the liability of defendant Ms. McCombs–Ellison for the assessed amounts is established.

Once the government has met its burden of proof on the issue of the taxpayer's liability for the withholding taxes by introducing the Certificates of Assessment, as the government has in this case, the burden shifts to the taxpayer to prove that he is not "responsible" or "willful" within the meaning of 26 U.S.C. § 6672. As succinctly stated by the Second Circuit,

> [i]t is well established that the statute requires two elements to be present before personal liability for unpaid withholding taxes attaches: first, the individual must

be a person responsible for the collection and payment of withholding taxes, *i.e.*, he must have the authority to direct the payment of corporate funds; second, the individual's failure to comply must be willful. *See, e.g., Caterino v. United States*, 794 F.2d 1, 3 (1st Cir.1986), *cert. denied*, 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987); *Teel v. United States*, 529 F.2d 903, 905 (9th Cir.1976); *Werner v. United States*, 374 F.Supp. 558, 560 (D.Conn.1974), *aff'd on opinion below*, 512 F.2d 1381 (2d Cir.1975). The individual against whom the assessment is made bears the burden of proving by a preponderance of the evidence that one or both of these elements is not present. *See, e.g., Calderone v. United States*, 799 F.2d 254, 258 (6th Cir.1986); *Lesser v. United States*, 368 F.2d 306, 310 (2d Cir.1966) (in banc).

*Hochstein v. United States*, 900 F.2d 543, 546 (2d Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992). Thus, "[i]n § 6672 penalty tax cases, the party against whom the penalty is assessed has the burden of proving that he is not a responsible officer or that he did not willfully fail to pay." *Curley v. United States*, 791 F.Supp. at 56; *Ruth v. United States*, 823 F.2d at 1093 ("the taxpayer must bear the risk of nonpersuasion as to all issues presented by a section 6672 assessment case").

### 1. *Nancy McCombs–Ellison is a Responsible Person Within the Meaning of 26 U.S.C. § 6672* [11]

■ "[T]he issue [of] whether a person is responsible within the meaning of section 6672 presents a mixed question of fact and law." *Hochstein v. United States*, 900 F.2d at 547. Even though defendants conceded at trial that there were few, if any, issues of fact in this case, Ms. McCombs–Ellison testified at trial to the effect that she was not a responsible person within the meaning of 26 U.S.C. § 6672. Because I find Ms. McCombs–Ellison's trial testimony incredible on this issue, I am unable to give any weight to it. I further find that the government's account of the facts accorded with the evi-

---

**11.** "The phrase 'responsible person' has become the customary shorthand to describe the first element of liability." *Simpson v. United States*, 664 F.Supp. 43 (E.D.N.Y.1987).

dence introduced at trial. Applying the facts to the law on the issue of responsibility pursuant to 26 U.S.C. § 6672, discussed *infra*, I find that Ms. McCombs–Ellison was responsible for the collection and payment of the withholding taxes paid to employees of Spinnaker Pole, a responsibility she failed to meet.

A person responsible for the collection of, accounting for, and paying over of the withheld employee taxes is defined by 26 U.S.C. § 6671. *Mazo v. United States*, 591 F.2d at 1153.

> The term "person," as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

26 U.S.C. § 6671(b). Generally, "responsible persons are subject to a duty to apply any available unencumbered funds to reduction of accrued withholding tax liability." *Mazo v. United States*, 591 F.2d at 1154. Duty as defined "under § 6671(b) has a much more focused meaning than the generalized duty of all taxpayers to pay taxes and is expressly limited to the duty that attaches to the position an employee holds within the corporation." *United States v. Burger*, 717 F.Supp. 245, 248 (S.D.N.Y.1989). Although "[t]his duty is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursal of funds," *Monday v. United States*, 421 F.2d at 1214–1215, an individual is not a responsible person by "[t]he mere holding of [a] corporate office alone, ..." *Schwinger v. United States*, 652 F.Supp. at 467; *see Monday v. United States*, 421 F.2d at 1214 ("Corporate office does not, *per se*, impose the duty to collect, account for and pay over the withheld taxes. On the other hand, an officer may have such a duty even though he is not the disbursing officer"). Because "[t]he key element ... is whether that person has the statutorily imposed duty to make the tax payments," "the duty is considered in light of the person's authority over an enterprise's finances or general deci-

sion making." *O'Connor v. United States*, 956 F.2d 48, 51 (4th Cir.1992).

A responsible person, then, is generally "any person who has significant control over the corporation's affairs and participates in decisions concerning what bills should or should not be paid and when, and thus determines whether the United States or other creditors will be paid." *United States v. Burger*, 717 F.Supp. at 248. *See Ruth v. United States*, 823 F.2d at 1094 ("the 'key to liability' is significant control or authority over an enterprise's finances or general decision making") (quoting *Purdy v. United States*, 814 F.2d 1183, 1188 (7th Cir.1987)). Knowledge is not a prerequisite. *Davis v. United States*, 961 F.2d 867, 873 (9th Cir. 1992) ("responsibility is a matter of status, duty and authority, not knowledge"); *Gustin v. United States Internal Revenue Service*, 876 F.2d 485, 491 (5th Cir.1989) (same); *Mazo v. United States*, 591 F.2d at 1156 (same).

In "determining whether an individual is responsible for collecting and paying withholding taxes," *Hochstein v. United States*, 900 F.2d at 547, the Second Circuit has held that the

> factors [to be] considered by the court ... includ[e] the individual's duties as outlined in the corporate bylaws, his ability to sign checks, his status as an officer or director, and whether he could hire and fire employees.... The central question, however, is whether the individual has significant control over the enterprise's finances.

*Id.* (citations omitted); *Silverberg v. United States*, 524 F.Supp. 744, 747 (E.D.N.Y.1981) (quoted in *Schwinger v. United States*, 652 F.Supp. at 467) (same). It should also be noted that "[t]he term 'responsible person' is broad and may include many individuals connected with a corporation, and more than one individual may be the responsible person for an employer." *O'Connor v. United States*, 956 F.2d at 50. When considering these factors,

> [t]he focus must instead be on substance rather than form.... The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general manage-

ment, or is under a duty to do so, before that officer can be deemed to be a responsible person.

*Id.* 956 F.2d at 51 (citations omitted).[12]

Under these standards, therefore, Ms. McCombs–Ellison is clearly a responsible person within the meaning of 26 U.S.C. § 6672: Not only was she President of Spinnaker Pole and had signatory authority (*see* Government Exhibit 2), she possessed a significant degree of control over the financial affairs of both corporations, evidence of which is the purchase offer she singularly executed when she bought the Edgewater Restaurant.[13] She further testified at trial that she did some of the hiring, even though this task fundamentally belonged to Jon Ellison. Transcript, at p. 38.

■ It was Ms. McCombs–Ellison's testimony concerning her responsibility to "take care of the books," however, that I found most incredible. She repeatedly contradicted what she had said during her 1989 deposition regarding her role as Spinnaker Pole's bookkeeper, and steadfastly maintained that she knew nothing of the books.[14] She did acknowledge at trial, however, that she made "sure that everyone got paid," apparently by reminding Jon Ellison to do so. Transcript, at p. 42, lines 13–15. But even if Ms.

McCombs–Ellison had charged Jon Ellison with the duty to pay the employees, "the mere delegation of responsibility to another does not constitute reasonable cause" to "exclude the failure to collect, account for, or pay over withholding taxes, ... *Mazo v. United States,* 591 F.2d at 1155. Similarly, Ms. McCombs–Ellison's claimed delegation of bookkeeping responsibilities to the restaurant's accountant, Mr. Gryman, cannot absolve her of liability for failing in her duty to ensure that the government was paid the taxes it was due. *Monday v. United States,* 421 F.2d at 1214 ("liability attaches to those with power and responsibility within the corporate structure for seeing that the taxes withheld from various sources are remitted to the government").

In short, Ms. McCombs–Ellison failed to present any credible evidence, testimonial or otherwise, to show that she was not a responsible person within the meaning of the statute. She thus failed in her burden of proving that she was not a responsible person.

### 2. Ms. McCombs–Ellison Willfully Failed to Pay Withholding Taxes Within the Meaning of 26 U.S.C. § 6672

"The question whether a particular person willfully failed to carry out h[er] responsibility of causing the corporation to collect or pay

---

**12.** An example of "form" given by the *O'Connor* court is "where the taxpayer assumes a title merely for the purpose of protecting his investment." *O'Connor v. United States,* 956 F.2d at 51. The court in *Godfrey v. United States,* 748 F.2d 1568 (Fed.Cir.1984) defined "substance" as a person's "power to compel or prohibit the allocation of corporate funds." *Id.* 748 F.2d at 1576. Evidence of such power is that person's "authority to sign the checks of the corporation ..., or to prevent their issuance by denying a necessary signature." *Id.*

**13.** Ms. McCombs–Ellison executed the purchase offer in her name only, and not on behalf of either corporation. The mortgage taken back by Edgewater, however, was executed in her and Jon Ellison's names, in their capacities as partners of Port and Starboard. Port and Starboard then leased the restaurant to Spinnaker Pole, which in turn conducted the daily operations and business affairs of the restaurant, including the duty to pay employee wages.

**14.** An example of this can be seen in the following exchange that took place when she was cross-examined by counsel for the Government:

Q [Referring to Ms. McCombs–Ellison's deposition] At that time I asked you this question and you gave this answer. I said what were your functions and your answer was, I was a hostess and I took care of the books and almost everything. I did everything.

A No, I never took care of the books. I did everything though. I mean, dishwashing, everything else, cleaned, but I'm not familiar with the books. I mean, my ex-husband can tell you that. I have no knowledge of it.

Q Okay, so you're saying that this was a wrong answer when you gave it at the deposition?

A Maybe I said I did everything because I remember saying that because of the fact that I did do everything.... I remember I did everything because of the fact that I did get stuck in everything, but the books, I have no knowledge of that.... I don't have any knowledge of anything like that. I have to admit, I'm stupid. Taxes and everything else.

THE COURT: What did you mean when you said take care of the books when you testified at your deposition?

A I don't remember taking care of the books as far a—I really don't remember that.

Transcript, at pp. 41–42.

over taxes depends upon the facts and circumstances of each case." *Feist v. United States*, 607 F.2d 954, 957, 221 Ct.Cl. 531 (1979); *Teel v. United States*, 529 F.2d 903, 905 (9th Cir.1976); *Mazo v. United States*, 591 F.2d at 1157 (because "[t]he issue of willfulness is necessarily directed to the state of the responsible person's mind, a subjective determination," "this determination is usually factual").

The general rule is that "[a] person willfully fails to pay withholding taxes within the meaning of section 6672 when he pays other creditors with knowledge that withholding taxes are due." *Hochstein v. United States*, 900 F.2d at 548. Thus, once a responsible person becomes "aware of the liability to the government, [she is] under a duty to ensure that the taxes were paid before any payments were made to other creditors." *Mazo v. United States*, 591 F.2d at 1157. "[P]ayment of wages while previously incurred withholding and FICA taxes have not been paid over [to the government] constitutes payments to creditors other than the government." *Carter v. United States*, 717 F.Supp. at 194.

■ The Supreme Court in *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978), was careful to note, however, that

> Section 6672 cannot be read as imposing upon the responsible person an absolute duty to "pay over" amounts which should have been collected and withheld. The fact that the provision imposes a "penalty" and is violated only by a "willful violation" is itself strong evidence that it was not intended to impose liability without personal fault.

*Id.* 436 U.S. at 254, 98 S.Ct. at 1788. Thus, "the statute cannot be construed to impose liability without fault, ..." *Id.* 436 U.S. at 254, 98 S.Ct. at 1789. Accordingly, the willfulness element "denotes intentional, knowing and voluntary acts. It may also indicate a reckless disregard for obvious or known risks." *Monday v. United States*, 421 F.2d at 1215. Even though "willfulness may be established by a showing of gross negligence involving a known risk of violation," *Ruth v. United States*, 823 F.2d at 1094, "[m]ere

negligence is not sufficient proof of willfulness." *Feist v. United States*, 607 F.2d at 961. Thus the decision not to remit employee withholding taxes to the government must be "voluntary, conscious and intentional—as opposed to accidental." *Monday v. United States*, 421 F.2d at 1216.

■ Liability under 26 U.S.C. § 6672, however, "does not depend upon the presence of bad motive or the specific intent to defraud the government or deprive it of revenue." *Id.* See *Hochstein v. United States*, 900 F.2d at 549 ("an individual's good or bad motive in failing to collect and pay taxes is irrelevant to the willfulness determination"); *Gustin v. United States*, 876 F.2d at 492 ("[w]illfulness under the statute requires a voluntary, conscious, and intentional act, but not a bad motive or evil intent"); *Schwinger v. United States*, 652 F.Supp. at 468 ("[i]t is well settled that although section 6672 has some characteristics of a penalty, the government need not show criminal or evil intent or motive"). "Willful conduct also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the government." *Kalb v. United States*, 505 F.2d at 511. Such a failure to investigate constitutes "reckless disregard of a known risk that the trust funds may not be remitted to the government, ..." *Garsky v. United States*, 600 F.2d 86, 91 (7th Cir.1979); *Schwinger v. United States*, 652 F.Supp. at 469 ("The failure to inquire into the status of withholding taxes after learning of the delinquency constitutes the reckless disregard that meets the willfulness requirement").

A variation on the reckless disregard test was articulated by the Seventh Circuit in *Wright v. United States*, 809 F.2d 425 (7th Cir.1987). In *Wright*, the court held that a responsible person may also be found liable for failing in his duty to pay withholding taxes "if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Id.* 809 F.2d at 427. This test is met when "a responsible officer knows that the corporation has recently committed such a delinquency and knows that since then its

affairs have continued to deteriorate, [and when such responsible officer] ... fails to take any steps either to ascertain ... what the state of the tax withholding account is, ... or to institute effective financial controls to guard against nonpayment. *Id.* 809 F.2d at 428.

■ Applying this standard of "reckless" or "conscious" disregard, I find that Ms. McCombs–Ellison willfully failed to pay over to the government the withholding taxes due it. She testified at trial that she "made sure that [the employees] were paid." Transcript, at p. 43, line 9. Ms. McCombs–Ellison thus had some knowledge of, and involvement in, the payroll aspects of the business. Her constant protestations that "she was stupid" and "didn't know anything" cannot excuse her failure to investigate the state of the withholding taxes due the government because she "was in a position to find out for certain very easily." *Wright v. United States,* 809 F.2d at 427. The fact that she and Jon Ellison were the only officers of Spinnaker Pole, and her testimony that she was otherwise involved in virtually every aspect of the business, lead to the unmistakable conclusion that she "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid ..." *Id.*

Ms. McCombs–Ellison further acknowledged that she became aware that withholding taxes were due, although it is unclear from her testimony at what point in time that was. Despite this knowledge, there is no evidence that she made any effort "to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the government." *Kalb v. United States,* 505 F.2d at 511. Even after having received notice that Spinnaker Pole was delinquent on paying its employee withholding taxes, Ms. McCombs–Ellison "failed to take any steps ... to ascertain ... what the state of the tax withholding account" was. *Wright v. United States,* 809 F.2d at 428. Consequently, her "failure to investigate rises to the level of reckless disregard, which is

sufficient to establish the willfulness element of § 6672 liability." *Schwinger v. United States,* 652 F.Supp. at 470 n. 5.

■ There is one additional factor that merits consideration—the bankruptcy of Spinnaker Pole. Spinnaker Pole declared bankruptcy in September, 1981. The bankruptcy, as well as Ms. McCombs–Ellison's testimony, clearly show that Spinnaker Pole was in serious financial trouble. It is important to observe, however, that "[e]ven adjudication as a bankrupt does not discharge liability for taxes withheld from employees," *Kalb v. United States,* 505 F.2d at 509, because "an individual's liability under section 6672 is separate and distinct from the corporation's tax liability." *Hochstein v. United States,* 900 F.2d at 549. Consequently, the Internal Revenue Service may assess the penalty and collect it from the individual, even if the corporation has sought protection under the bankruptcy laws. *Id.* The Bankruptcy Code "provides a priority for specified tax claims, including those [under 26 U.S.C. § 6672] ..., and makes those debts nondischargeable." *United States v. Energy Resources Co., Inc.,* 495 U.S. at 549, 110 S.Ct. at 2142.[15]

■ Consideration of "the financial condition of the business or the demands of creditors" is therefore "misleading and improper." *Monday v. United States,* 421 F.2d at 1216. Ms. McCombs–Ellison's trial testimony revealed that other creditors, such as Port and Starboard whose sole income was derived from the rental payments it received from Spinnaker Pole, were paid before the government. Hence, it is evident that she paid "other creditors with knowledge that withholding taxes [we]re due." *Hochstein v. United States,* 900 F.2d at 548. Notwithstanding the understandable desire to keep the business going, the rule that "the voluntary, conscious and intentional act to prefer other creditors of the corporation over the United States" constitutes willfulness, *Gold v. United States,* 506 F.Supp. 473, 479 (E.D.N.Y.1981), *aff'd,* 671 F.2d 492 (2d Cir. 1981) (quoted in *Schwinger v. United States,*

---

**15.** *See* 11 U.S.C. § 507(a)(7)(C) ("a tax required to be collected or withheld and for which the debtor is liable in whatever capacity"); 11 U.S.C. §§ 523(a)(1)(A) ("A discharge under ... this title does not discharge an individual debtor from any debt for a tax ...").

652 F.Supp. at 468), "holds true even if the expenditures are necessary to remain in business." *Schwinger v. United States*, 652 F.Supp. at 468. Consequently, Ms. McCombs–Ellison "willfully disregarded her duty," *Feist v. United States*, 607 F.2d at 961, when she paid "other creditors with knowledge that withholding taxes [we]re due." *Hochstein v. United States*, 900 F.2d at 548.

### C. The Lien Attached to 74 Meadow Creek Lane as of Date of Assessment

■ 26 U.S.C. § 6321 [16] "authorizes the imposition by the government of a tax lien upon the property of the taxpayer when [s]he is in default." *United States v. 110–118 Riverside Tenants Corp.*, 886 F.2d 514, 518 (2d Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990). "[T]he lien imposed by section 6321 arise[s] at the time the assessment is made and ... continue[s] until the liability for the amount so assessed ... is satisfied." 26 U.S.C. § 6322. Specifically, upon assessment, "the law creat[s] a lien in favor of the United State on all real and personal property belonging to the [taxpayer]," *United States v. McDermott*, —— U.S. ——, ——, 113 S.Ct. 1526, 1527, 123 L.Ed.2d 128 (March 24, 1993), and "is effective ... against all persons, even in the absence of recordation of the lien." *Don King Productions, Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir.1991).[17] Accordingly, a lien in the amount of $26,925.79 was created on

June 14, 1982, and lien attached to Ms. McCombs–Ellison's property located at 74 Meadow Creek Lane on that date. The issue thus becomes whether the government's tax lien has priority over the encumbrances on the property at 74 Meadow Creek Lane. As the following discussion indicates, the government's liens are entitled to priority over all encumbrances on the property.

### D. Priority of United States' Tax Lien

■ "[T]he relative priority of a United States lien for unpaid taxes is a federal question." *United States v. Equitable Life Assurance Society of the United States*, 384 U.S. 323, 330, 86 S.Ct. 1561, 1565, 16 L.Ed.2d 593 (1966). However, "both federal and state courts must look to state law" when determining whether a taxpayer has property, or property rights, to which a federal tax lien could attach. *Aquilino v. United States*, 363 U.S. 509, 512–513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960); *United States v. Brosnan*, 363 U.S. 237, 240, 80 S.Ct. 1108, 1111, 4 L.Ed.2d 1192 (1960). But "once the tax lien has attached to the taxpayer's state-created interests, ... federal law ... determines the priority of competing liens asserted against the taxpayer's" property rights. *Aquilino v. United States*, 363 U.S. at 513–514, 80 S.Ct. at 1280; *United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983) ("it has long been an axiom of our tax collection scheme that, although the definition of property interests is left to state law,

---

**16.** If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
 26 U.S.C. § 6321.

**17.** This lien has been referred to as a "secret" lien, "which remains undisclosed until the Government files notice." Notwithstanding, the Government's failure to immediately file notice of the assessment "does not affect the immediate attachment of a tax lien when liability is admitted or assessed."
 *Sgro v. United States*, 609 F.2d 1259, 1261 (7th Cir.1979).

It should also be noted that while "ordinary collection procedures require a notice of deficiency (26 U.S.C. 6212(a)) to precede an assessment of unpaid tax (26 U.S.C. 6201) and a second notice and demand for payment (26 U.S.C. 6303) to precede any additional steps to enforce collection and payment (26 U.S.C. 6331), the notice provisions of 6212 and 6213 do not apply to the assessment of withholding taxes." *Jacobson v. Organized Crime and Racketeering Section of the United States Dept. of Justice*, 403 F.Supp. 1332, 1336 (E.D.N.Y.1975), *aff'd* 544 F.2d 637 (2d Cir.1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977); *see also United States v. Berman*, 825 F.2d 1053 (6th Cir.1987) (Notice and demand are not prerequisites to a civil suit by the government to reduce assessment to judgment because complaint, which is prerequisite to civil suit, provides adequate notice to taxpayer).

the consequences that attach to those interests is a matter left to federal law").

As the facts above indicate, there is no dispute that Ms. McCombs–Ellison owned the property in question at the time the lien arose on June 14, 1982. Nor is it disputed that the property was encumbered by the remaining principal balance of the Columbia Bank Purchase Money Mortgage, as well as by the remaining principal on the $50,000 Marine Midland Bank mortgage. Despite the liens created by the mortgages, title to the 74 Meadow Creek Lane property remained in Ms. McCombs–Ellison. *Goodell v. Silver Creek National Bank*, 48 N.Y.S.2d 572 (Sup.Ct. Chautauqua Co.1944), *aff'd* 268 A.D. 1020, 53 N.Y.S.2d 529 (4th Dept.1944) ("A mortgagor is one, who having some part of the title to property, by written instrument pledges that property for some particular purpose such as security for a debt"). Therefore, she may be said to have had an interest in the property at the time the lien arose, subject, of course, to the Columbia Banking and Marine Midland mortgages. Indeed Ms. McCombs–Ellison conveyed her interest in the property to her daughters on September 15, 1982. In exchange, they assumed the remaining principal balance on the Columbia Banking mortgage, and further agreed to take the premises subject to the Marine Midland Bank mortgage. Because it is clear that Ms. McCombs–Ellison has a state-created property interest, and because "the consequences that attach to those interests is a matter left to federal law," *United States v. Rodgers*, 461 U.S. at 683, 103 S.Ct. at 2137, this court must look to federal law, in order to "determine[ ] the priority of competing liens asserted against the taxpayer's [Ms. McCombs–Ellison]" property rights. *Aquilino v. United States*, 363 U.S. at 513–514, 80 S.Ct. at 1280; *PPG Industries, Inc.*

*v. Hartford Fire Insurance Co.*, 531 F.2d 58, 61 (2d Cir.1976) ("[t]he resolution of priority conflicts involving federal tax liens is a matter of federal law requiring an interpretation of 26 U.S.C. § 6323"); *Hartford Provision Co. v. United States*, 579 F.2d 7, 9 (2d Cir. 1978) (same).

The Supreme Court addressed the issue of federal tax lien priority very recently, stating that tax liens "do not automatically have priority over all other liens. Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principal that 'the first in time is the first in right.' " *United States v. McDermott, supra*, — U.S. at ——, 113 S.Ct. at 1528 (citations omitted). In applying this doctrine, the Court referred to 26 U.S.C. § 6323(a). *Id.* This section protects "certain persons ... against unrecorded federal tax liens," *Don King Productions, Inc. v. Thomas*, 945 F.2d at 533, and provides that "[t]he lien imposed by section 6321 shall not be valid as against the purchaser, [or] holder of a security interest, ... until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." 26 U.S.C. § 6323(a). "Only those persons specifically listed in the statute are entitled to priority over unrecorded federal tax liens." *Don King Productions, Inc. v. Thomas*, 945 F.2d at 533.

> Section 6323(f) provides, in substance, that, if under the state law a deed is not valid against a *bona fide* purchaser unless its filing has been recorded in a public index, the tax lien is not valid against a purchaser unless the fact of its filing is recorded in a public federal tax lien index so that a reasonable inspection of the index will reveal the existence of the lien.

*Burbano v. United States*, 723 F.Supp. 193, 194 (E.D.N.Y.1989).[18] "The question is whether [defendants Kelly and Mary McCombs] bought the premises free of the

---

**18.** In the case of real property, if

(A) under the laws of the State in which the real property is located, a deed is not valid as against a purchaser of the property who (at the time of the purchase) does not have actual notice or knowledge of the existence of such deed unless the fact of filing of such deed has been entered and recorded in a public index at the place of filing in such a manner that a reasonable inspection of the index will reveal the existence of the deed; and

(B) there is maintained ... an adequate system for the public indexing of Federal tax liens, then the notice of lien referred to in subsection (a) shall not be treated as meeting the filing requirements under paragraph (1) unless the fact of filing is entered and recorded in the index referred to in subparagraph (B) in such a manner that a reasonable inspection of the index will reveal the existence of the lien.

26 U.S.C. § 6323(f)(4).

lien, and that turns on whether the United States provided notice of the lien in accordance with section 6323(f) before [defendants] made and recorded the purchase." *Id.*, 723 F.Supp. at 195.

To provide notice in accordance with § 6323(f), the government must comply with New York's recording statute, N.Y. Real Property Law § 291.[19] In New York, a lien is considered a conveyance because it may affect "the title to any real property," N.Y. Real Property Law § 290(3), and thus it must be recorded.

> The almost universal construction placed by courts upon the recording acts protects a subsequent purchaser as against a prior instrument if he pays value in ignorance of such instrument and makes the record of an instrument notice to the subsequent purchaser, irrespective of whether he actually examines the records so as to obtain such information.

*Cohen v. East Netherland Holding Co.*, 258 F.2d 14, 17 (2d Cir.1958) (construing N.Y. Real Property Law § 291). New York is a race-notice state. *Goldstein v. Gold*, 106 A.D.2d 100, 101, 483 N.Y.S.2d 375, 377 (2d Dept.1984), *aff'd* 66 N.Y.2d 624, 495 N.Y.S.2d 32, 485 N.E.2d 239 (1985). Therefore, "in order to cut off a prior lien, such as a mortgage, the purchaser must have no knowledge of the outstanding lien *and* win the race to recording office." *Id.*, 106 A.D.2d at 101–102, 483 N.Y.S.2d at 377 (emphasis in original).

 Subsequent purchasers may be charged with three types of notice in New York. The first is actual notice, which means that if an instrument is properly recorded, potential subsequent purchasers will learn of its existence upon actually searching the record chain of title. *Witter v. Taggart*, 78 N.Y.2d 234, 238, 573 N.Y.S.2d 146, 148, 577 N.E.2d 338, 340 (1991) ("The recording statutes in a grantor-grantee indexing system charge a purchaser with notice of matters only in the record of the purchased land's chain of title back to the original grantor"). Second, a properly recorded instrument also charges a subsequent purchaser with constructive notice of its existence. A subsequent purchaser is "not chargeable with constructive notice of conveyances recorded outside of that purchaser's direct chain of title …." *Id.*, 78 N.Y.2d at 239, 573 N.Y.S.2d at 149, 577 N.E.2d at 341. Third, the theory of inquiry notice provides that

> [w]here a purchaser of land has *knowledge of any facts sufficient to put him on inquiry* as to the existence of some right or some title in conflict with that which he is about to acquire, he is presumed either to have made the inquiry and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim to be considered as a bona fide purchaser.

*Sweet v. Henry*, 175 N.Y. 268, 276, 67 N.E. 574, 576 (1903) (emphasis supplied); *Wardell v. Older*, 70 A.D.2d 1008, 1009, 418 N.Y.S.2d 196, 197 (3rd Dept.1979) ("had an inquiry been made, [a prior] interest would have been discovered"). Thus, where a purchaser is charged with inquiry notice, due to "purchas[ing] with 'knowledge of facts that would lead a reasonably prudent purchaser to make inquiry,'" *Berger v. Polizzotto*, 148 A.D.2d 651, 652, 539 N.Y.S.2d 401, 402 (2d Dept. 1989) (quoting *Morrocoy Marine v. Altengarten*, 120 A.D.2d 500, 500, 501 N.Y.S.2d 701, 701 (2d Dept.1986), the practical effect is that

---

19. A conveyance of real property, … may be recorded in the office of the clerk of the county where such real property is situated, … Every such conveyance not so recorded is void as against any person who subsequently purchases or acquires … the same real property or any portion thereof, … in good faith and for a valuable consideration, …, and whose conveyance, … is first duly recorded.
 N.Y. Real Property Law § 291.
 The state recording statute, Real Property Law § 291, provides that any conveyance of real property which is not recorded in the office of the clerk of the county where that property is situated, shall be void as against a subsequent purchaser who acquires the property in good faith and for valuable consideration.
*Reynolds v. Springer Service Station, Inc.*, 151 A.D.2d 466, 467, 542 N.Y.S.2d 256, 257 (2d Dept.1989).
 The definition of purchaser contained within 26 U.S.C. § 6323 also refers to state law:
 The term "purchaser" means a person who, for adequate and full consideration in money or money's worth, acquires an interest … in property which is valid under local law against subsequent purchasers without actual notice.
 26 U.S.C. § 6323(h)(6).

the subsequent purchaser can "not take advantage of [and be protected by] the Recording Act." *Wardell v. Older,* 70 A.D.2d at 1009, 418 N.Y.S.2d at 197. Thus, absent "knowledge of facts that would lead a reasonably prudent purchaser to make inquiry," *Morrocoy Marine v. Altengarten,* 120 A.D.2d at 500, 501 N.Y.S.2d at 703, "[t]here is generally no requirement that the purchaser make further inquiries to ascertain whether the purported assignee actually possessed the authority" to assign his interest in the property. *Andy Association v. Bankers Trust,* 49 N.Y.2d 13, 22, 424 N.Y.S.2d 139, 144, 399 N.E.2d 1160, 1165 (1979).

The general rule in New York, therefore, is that "[a] purchaser is not normally required to search outside the chain of title in order to determine if it is defective.... The recording acts charge the purchaser with notice only of matters in the record ... and matters outside of the chain of title do not constitute notice." *Doyle v. Lazarro,* 33 A.D.2d 142, 144, 306 N.Y.S.2d 268, 270 (3rd Dept.1970), *aff'd* 33 N.Y.2d 981, 353 N.Y.S.2d 740, 309 N.E.2d 138 (1974) (citations omitted). "The Recording Act, however, protects only those subsequent purchasers who purchase 'in good faith.' Subsequent purchasers who buy with notice or knowledge of a prior interest or equity take title subject to that prior interest." *United Matura Realty, Inc. v. Reade Industries, Inc.,* 155 A.D.2d 660, 661, 547 N.Y.S.2d 892, 893 (2d Dept.1989) (quoting N.Y. Real Property Law § 291).

Thus, the government has the burden of showing that either daughter, Mary and Kelly McCombs, had notice of the tax lien, or that they were not purchasers in "good faith." N.Y. Real Property Law § 291. The evidenced showed the following chronology of recordation of encumbrances on the property at 74 Meadow Creek Lane:

| | Date | Lienor | Amount [20] | Recorded |
|---|---|---|---|---|
| 1. | 2/16/62 | Columbia Banking | $30,000.00 [21] | 2/16/62 |
| 2. | 5/27/82 | Marine Midland Bank | $50,000.00 | 5/27/82 |
| 3. | 6/14/82 | United States | $26,925.79 | 9/22/82 |
| 4. | 9/15/82 | Transfer to Kelly & Mary McCombs | | 9/16/82 |

The chronology clearly shows that, under the laws of New York, Mary and Kelly McCombs did not have notice of the tax lien because it was recorded after the property had been transferred to them by Ms. McCombs–Ellison, and thus was outside the chain of title. Further, the government has not shown that Mary and Kelly McCombs had "actual knowledge of a defect in title [which would] 'impeach[ ] the[ir] good faith ...'" *United Matura Realty, Inc. v. Reade Industries, Inc.,* 155 A.D.2d at 662, 547 N.Y.S.2d at 894 (quoting *Peloke v. Scheid,* 135 Misc.2d 606, 608–609, 515 N.Y.S.2d 1000, 1001–1002 (Greene Co. Ct.1987)). It is possible, however, that Mary and Kelly McCombs knew of the tax assessment when they purchased the property because of their family relationship with their mother. But even had they been chargeable with a duty to make inquiry notice, based on their "knowledge of any facts sufficient to put [them] on inquiry," *Sweet v. Henry,* 175 N.Y. at 276, 67 N.E. at 576, a search of the record would not have shown the government's lien. Therefore, they cannot be charged with notice of the lien because it was outside the chain of title and was not recorded in accordance with the requirements of 26 U.S.C. § 6323(f).

With respect to the "good faith" requirement, the government argued at trial that "pretty much the same elements of the fair consideration under the fraudulent conveyance analysis" may be used to prove Mary and Kelly McCombs' lack of good faith in

---

**20.** As of the date of encumbrance.

**21.** This mortgage is no longer a lien on the property. All parties concede that the Columbia Banking mortgage debt has since discharged and that Columbia Banking is no longer a defendant in the case.

purchasing the home. Transcript, at p. 11, lines 19–20. Consequently, the following discussion will focus on the issue of whether the conveyance by Ms. McCombs–Ellison to her daughters on September 15, 1982 was fraudulent.

### E. Fraudulent conveyance [22]

■ "[A] creditor has standing to maintain an action to set aside a fraudulent conveyance, even if the debt was not in existence at the time of the transfer." *United States v. Red Stripe, Inc.*, 792 F.Supp. at 1343. The government is a creditor within the meaning of N.Y. Debtor & Creditor Law § 270 because at the time of the conveyance, it had a "claim" on the property for the lien that was assessed on June 14, 1982. Furthermore, "what is deemed to be a fraudulent conveyance and the extent to which a creditor may obtain judgment against the transferee for the transferor's liability—is determined by reference to applicable state law." *De West Realty Corp. v. I.R.S. of United States*, 418 F.Supp. 1274, 1278 (S.D.N.Y.1976). The government argues two theories of fraudulent conveyance under N.Y. Debtor and Creditor Law, §§ 270 *et seq.*

#### 1. *N.Y. Debtor & Creditor Law § 273*

The first theory is under § 273, which provides that

> [e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y. Debtor & Creditor Law § 273. Under this section,

> there are three elements to a claim for fraudulent conveyance:

> (1) the transfer must be a "conveyance" within the meaning of the Act;

> (2) the conveyance must be made "without fair consideration;"

> (3) the conveyance must be made "by a person who is or hereby will be rendered insolvent."

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1272 (S.D.N.Y.1991) (quoting N.Y. Debtor & Creditor Law §§ 270 *et seq.*) (footnote omitted); *Hickland v. Hickland*, 100 A.D.2d 643, 645, 472 N.Y.S.2d 951, 954 (3rd Dept.1984) ("To be fraudulent as against creditors, the conveyance must render the debtor insolvent and be made without fair consideration"). A mere conveyance of property, however, "absent fair and adequate consideration . . . is not deemed fraudulent as to creditors unless the grantor debtor is insolvent." *Aluminum Supply Co. v. Camelio*, 32 Misc.2d 292, 295, 223 N.Y.S.2d 26, 28 (Sup.Ct. Monroe Co.1962). Moreover, under § 273, "actual intent to defraud need not be shown; constructive intent is established if the debtor was insolvent at the time of the transfer, or was rendered insolvent thereby." *Matter of Tabala*, 11 B.R. 405, 408 (S.D.N.Y. 1981). It is undisputed that the conveyance was made on September 15, 1992.[23] The question is whether Ms. McCombs–Ellison was "insolvent at the time of the transfer, or was rendered insolvent thereby." *Id.*

N.Y. Debtor & Creditor Law § 271(1) defines insolvency as follows:

> A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

A debt "includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* § 270. The only asset at issue in this case is

---

**22.** The government states that this argument pertains to the tax assessment of April 16, 1984. Because I did not find that New York law distinguished between present and future creditors, I will be considering the fraudulent conveyance argument as in light of the June 14, 1982 tax assessment as well. *See* N.Y. Debtor & Creditor L. §§ 273 (fraud as to "creditors") & 276 (fraud as to "present or future creditors"). *De West Realty Corp. v. I.R.S. of United States*, 418

F.Supp. 1274, 1278–1279 (S.D.N.Y.1976); *AMEV Capital Corp. v. Kirk*, 180 A.D.2d 775, 776, 580 N.Y.S.2d 422, 423 (2d Dept.1992).

**23.** "Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage . . . , and also the creation of any lien or incumbrance.
N.Y. Debtor & Creditor Law § 270.

the 74 Meadow Creek Lane property. No evidence was introduced at trial pertaining directly to the issue of the property's "fair salable value." The parties, however, referred to government Exhibit 13, the Civil Action Narrative report prepared by Internal Revenue Officer Richard P. Shimko, dated September 19, 1985. Counsel for defendants Ms. McCombs–Ellison and Robert McCombs, Michael Mazzulo, Esq., argued in his post-trial brief that the government failed to introduce evidence on this issue, and that therefore the report of the IRS agent was not reliable as to the value listed. Nevertheless, Mazzulo adopted the $85,657 figure and used it as the basis of one of his post-trial arguments.[24] Consequently, I will also be using this figure when comparing the value of Ms. McCombs–Ellison's assets to her debts, even though it may not, at present, be the property's "fair salable value." Additionally, in making a determination as to Ms. McCombs–Ellison's insolvency, "[c]ash flow is not a factor, and an 'inability to pay current obligations as they mature does not show insolvency.'" *Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.*, 621 F.Supp. 198, 220 (S.D.N.Y.1985) (quoting *McCarty v. Nostrand Lumber Co.*, 232 A.D. 63, 248 N.Y.S. 606 (2d Dept.1931)).

There is "a presumption of insolvency when a debtor transfers his property without consideration when debts are outstanding." *Matter of Tabala*, 11 B.R. at 408. Because Ms. McCombs–Ellison transferred the property in consideration for her daughters' assumption of the remaining outstanding Columbia Banking mortgage debt, as well as taking the property subject to her mortgage to Marine Midland Bank, it cannot be said that the transfer was made without any consideration at all. But the issue of whether the consideration was "fair" must still be addressed. *Atlanta Shipping Corp., Inc. v. Chemical Bank*, 818 F.2d 240 (2d Cir.1987) ("An essential element of a claim pursuant to [N.Y. Debtor & Creditor Law] § 273 ... is

lack of fair consideration"). If the proof shows that "the transferor failed to receive *fair* consideration for the conveyance and was, thereby, rendered insolvent, section 273 renders a presumption that the conveyance was fraudulent." *United States v. Orozco–Prada*, 636 F.Supp. 1537, 1541 (S.D.N.Y. 1986), *aff'd* 847 F.2d 836 (2d Cir.1988) (emphasis added).

The issue of "[w]hat constitutes fair consideration under this section must be determined upon the facts and circumstances of each particular case...." *Orbach v. Pappa*, 482 F.Supp. 117, 119 (S.D.N.Y.1979). Ordinarily, "[t]he burden of proof to establish that a debtor's conveyance was made without fair consideration is on the creditor." *ACLI Government Securities, Inc. v. Rhoades*, 653 F.Supp. 1388, 1391 (S.D.N.Y.1987), *aff'd* 842 F.2d 1287 (2d Cir.1988); *Gelbard v. Esses*, 96 A.D.2d 573, 576, 465 N.Y.S.2d 264, 268 (2d Dept.1983) (memorandum) (same). But "[w]here a transfer involves a family transaction, the transferee bears the burden of proof that the transfer was made with fair consideration." *In re Tesmetges*, 85 B.R. 683, 695 (E.D.N.Y.1988). *Orbach v. Pappa*, 482 F.Supp. at 119 ("In an intrafamily transaction, it is well-settled that a heavier burden is placed on the grantee to establish fair consideration for the transfer"). Thus the burden is on defendants Mary and Kelly McCombs to establish that they gave fair consideration for the 74 Meadow Creek Lane property.

N.Y. Debtor & Creditor Law § 272 defines fair consideration as an exchange of property, or a satisfaction of a debt, that is "a fair equivalent" to the property conveyed. The statute also requires that the exchange be done in good faith. *Id.* at § 272(a). In addition, the amount may not be "disproportionately small as compared with the value of the property." *Id.* at § 272(b).

■ In construing the statute, a "test" for determining whether fair consideration

---

24. I agree with Mr. Mazzulo's post-trial argument that the Government's failed to "provide any testimonial evidence" by calling the agent as a witness "to establish for the Court how these numbers were arrived at." Defendants Post-Trial Brief at 3–4. Accordingly, I will disregard the estimate provided by the agent in Exhibit 13

of $125,000 because, as correctly pointed out by Mr. Mazzulo, this figure was based on the agent's survey of comparable sales in the area, for which no documentary support is provided, and also because the estimate was made in 1985, as opposed to 1982, when the property was conveyed.

was given for the exchanged property is applied. "The test for fair consideration has two prongs, requiring an equivalent exchange of value *and* good faith. Thus even where there is a fair exchange of value . . ., the conveyance may be set aside if good faith is lacking." *In re Fill,* 82 B.R. 200, 216 (S.D.N.Y.1987) (emphasis in original); *Hickland v. Hickland,* 100 A.D.2d at 645, 472 N.Y.S.2d at 954 ("element of 'good faith' necessary to attain the status of 'fair consideration'") (quoting N.Y. Debtor & Creditor Law § 272(a)).

▇▇▇▇▇ As stated above, the value of the property at the time of the conveyance was at least $85,657.00. Kelly and Mary McCombs took the property subject to the remaining principal balance on the Marine Midland mortgage, recited in the deed as $47,328.65. In so doing, they received property with a remaining equity of $39,328.35. They further agreed to assume the remaining principal balance on the Columbia Banking Mortgage, which, as recited in the deed, was $10,469.29.[25] Kelly and Mary McCombs thus received property with equity of $39,-328.35 in exchange for giving consideration of $10,469.29—a value approximately four times the amount of consideration given. I do not find this transfer to have been an "equivalent exchange of value." *In re Fill,* 82 B.R. at 216. Since defendants failed to meet their burden in satisfying the first prong of the test, the second good faith prong need not be considered. Furthermore, due to the lack of fair consideration given for the property, defendants Mary and Kelly McCombs cannot be purchasers within the meaning of 26 U.S.C. § 6323(h)(6).[26]

▇▇▇▇ Consequently, because Ms. McCombs–Ellison transferred the property without fair consideration when she was indebted to the federal government in the

amount of $26,925.79, I find that the presumption of insolvency applies. I find further that she did not meet her burden of proving that the transfer did not render her insolvent because her testimony did not touch on this subject and she otherwise introduced no evidence on this issue. *United States v. Red Stripe, Inc.,* 792 F.Supp. at 1342; *ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. at 1393; *McCarthy v. Sessions,* 170 A.D.2d 25, 28, 572 N.Y.S.2d 749, 751 (3rd Dept.1991) (defendants "presented nothing" to "establish the[ir] solvency . . . at the time of the transfer and thereby defeat the presumption of fraud"). In addition, because the conveyance is fraudulent under N.Y. Debtor & Creditor Law § 273, the government, "a creditor[,] may obtain judgment against any transferee to whom his debtor has transferred the property up to the value of the property, but not exceeding the amount of the creditor's claim." *De West Realty Corp. v. I.R.S. of United States,* 418 F.Supp. at 1278–1279.

### 2. N.Y. Debtor & Creditor Law § 276

▇▇▇ The government also argues that the property was fraudulently conveyed under N.Y. Debtor & Creditor Law § 276. This statute provides that

[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

"The burden of proof to establish 'actual intent' [under N.Y. Debtor & Creditor Law § 276] is on the creditor who seeks to set aside the conveyance, and he must do so by clear and convincing evidence." *ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. at 1394 (quoting N.Y. Debtor &

---

**25.** The Government argues that an assumption of a mortgage debt does not constitute "adequate and full consideration" for the transfer. Government Post–Trial Brief at 11. I find, however, that a mortgage assumption is deemed consideration under New York law. *Eskelson v. Inter–County Title Guaranty & Mortgage Co.,* 207 N.Y.S.2d 27, 29 (Sup.Ct. Nassau Co. 1960); *Onondaga County Savings Bank v. Markson Bros.,* 182 Misc. 954, 52 N.Y.S.2d 148, 151 (Co.Ct.

Onondaga Co. 1941), *aff'd* 263 A.D. 792, 32 N.Y.S.2d 109 (4th Dept.1941).

**26.** Because of this, the issue of whether Mary and Kelly McCombs' testimony may have aided the defense, raised after trial, is academic. It was never suggested that they would testify that a different consideration was given. Therefore, nothing else they might have testified to would have aided defendants on this issue.

Creditor Law § 276); *AMEV Capital Corp. v. Kirk*, 180 A.D.2d 775, 776, 580 N.Y.S.2d 422, 423 (2d Dept.1992); *Marine Midland v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dept.1986). But "the creditor is not required to show that the Debtor was insolvent at the time or after the time of transfer." *In re Zabkar*, 133 B.R. 3, 4 (W.D.N.Y.1991).

"[F]raudulent intent, by its very nature, is rarely susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act." *Id.* 120 A.D.2d at 128, 508 N.Y.S.2d at 21; *In re Fill*, 82 B.R. at 220 (actual fraudulent intent "is generally established by inference from the circumstances surrounding the alleged fraudulent transfer," which are commonly referred to as "badges of fraud").

> Factors from which fraudulent intent can be inferred include (1) a close relationship among the parties to the transaction; (2) secrecy and haste of the sale; (3) inadequacy of consideration; and (4) the transferor's knowledge of the creditor's claim and his own inability to pay it.

*ACLI Government Securities, Inc. v. Rhoades*, 653 F.Supp. at 1394. *See In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1041 (2d Cir.1984).

Ms. McCombs–Ellison is in a close relationship with her daughters. And, as previously determined, the consideration for the transfer was inadequate. Moreover, based on the exhibits introduced into evidence, and on Ms. McCombs–Ellison's testimony on cross-examination, I find further that Ms. McCombs–Ellison knew of the tax assessments against her. Her income tax returns (Government Exhibit 19) and the bankruptcy of both Spinnaker Pole and Port & Starboard lead to the conclusion that she did not have the ability to pay the assessments. I find additional "badges of fraud" in the fact that Ms. McCombs–Ellison conveyed the only property she owned, and further that she continued to reside there for some time after she transferred the property to her daughters. *See In re Tesmetges*, 85 B.R. 683 at 698. Finally, as the preceding discussion regarding Ms. McCombs–Ellison's liability

for the assessed penalty illustrates, she knew, or can be chargeable with knowledge of, her indebtedness to the government well in advance of the transfer of property.

"Where badges of fraud are shown, it is a well-settled rule that the burden shifts to the parties seeking to uphold the transfer to rebut the inferences thereby created and sustain the *bona fides* of the transaction." *In re Fill*, 82 B.R. at 226. Defendants Ms. McCombs–Ellison, Mary McCombs and Kelly McCombs have failed to rebut these inferences. Therefore, the government has met its burden in establishing that Ms. McCombs–Ellison possessed "actual intent ... to hinder, delay, or defraud" the United States government. N.Y. Debtor & Creditor Law § 276. And, because the government met its burden under § 276, it is entitled to attorney's fees pursuant to N.Y. Debtor & Creditor Law § 276–a. *Marine Midland v. Murkoff*, 120 A.D.2d at 125, 508 N.Y.S.2d at 19.

■ On the basis of the foregoing, I find defendants Kelly and Mary McCombs' contention that the transfer may not be set aside pursuant to N.Y. Debtor & Creditor Law § 278 to be without merit. Under subdivision two of this section,

> [a] purchaser who without fraudulent intent has given less than fair consideration for the conveyance or obligation, may retain the property ... as security for repayment.

N.Y. Debtor & Creditor Law § 278(2). By resting their argument on this provision, defendants Mary and Kelly McCombs concede that they gave less than fair consideration for the transfer. They argue, however, that they did not possess the requisite fraudulent intent. Notwithstanding, it is the good faith of the transferee that "is placed directly in issue by" this section. *Federal Deposit Insurance Co. v. Malin*, 802 F.2d 12, 18 (2d Cir.1986); *see id.* 802 F.2d at 19 ("the focus is on the good faith of the *transferee* as opposed to the transferor"). Thus they have the burden of proving that they obtained the property in good faith, a burden which cannot be met merely by showing the absence of fraudulent intent. *Southern Industries, Inc.*

*v. Jeremias,* 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 949 (2d Dept.1978). "The lack of good faith imports a failure to deal honestly, fairly and openly." *Id.* Further, because the transaction was an intra-family one, the "burden is placed on the grantee to establish fair consideration for the transfer." *Orbach v. Pappa,* 482 F.Supp. at 119. Just as they failed to meet their burden under N.Y. Debtor & Creditor Law § 273, by failing to establish that they paid fair consideration for the property, a fact which they concede, I find they have introduced no additional evidence which would enable them to meet their burden under N.Y. Debtor & Creditor Law § 278(2).

Consequently, the September 15, 1982 conveyance of property by Ms. McCombs–Ellison to her daughters, Mary and Kelly McCombs, may be set aside. The United States' tax liens have priority over the interests of Kelly and Mary McCombs in the property.

## F. Mortgage of Robert J. McCombs Does Not Have Priority Over United States Tax Liens

██ Pursuant to N.Y. Debtor & Creditor Law § 278, a creditor may cause a fraudulent conveyance to be "set aside ... to the extent necessary to satisfy his claim," or, in the alternative, may "disregard the conveyance and attach or levy upon the property conveyed." *Id.* at § 278(1)(a)–(b). A creditor may do so "as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase." *Id.* at § 278(1).

As noted previously, Robert McCombs took back a mortgage in the amount of $53,-000.00 from his daughters on January 18, 1985. In exchange, Mary and Kelly McCombs gave their father a security interest in the 74 Meadow Creek Lane property. As one who purchased from a fraudulent transferee, Robert McCombs has the burden

of proving that he was a *"bona fide* purchaser[ ] for valuable consideration and had neither actual nor constructive knowledge that the conveyance from [Ms. McCombs–Ellison to Mary and Kelly McCombs] was fraudulent." *United States v. Orozco–Prada,* 636 F.Supp. at 1542. Again, due the intra-family nature of transaction, the burden rests on Robert McCombs to show that he gave fair consideration for the January 18, 1985 mortgage he took back from his daughters. *Orbach v. Pappa,* 482 F.Supp. at 119.

As previously discussed, fair consideration requires that the transaction reflects an equivalent exchange of value and good faith. *In re Fill,* 82 B.R. at 216. Because Mr. McCombs took back a $53,000.00 mortgage on property with an approximate equity of $49,000,[27] it cannot be said that a fair equivalent of value was not exchanged. Because the first prong of the test is thus satisfied, it is necessary to inquire into the good faith of Robert McCombs in carrying out this transaction. *Hickland v. Hickland,* 100 A.D.2d at 645, 472 N.Y.S.2d at 954.

Good faith in this context depends on whether Robert McCombs had actual or constructive knowledge that the prior conveyance was fraudulent. *United States v. Orozco–Prada,* 636 F.Supp. at 1542. As discussed *supra,* New York's recording act charge a purchaser "with notice only of matters in the record ... and matters outside of the chain of title do not constitute notice." *Doyle v. Lazarro,* 33 A.D.2d at 144, 306 N.Y.S.2d at 270. But the recording act does not protect a subsequent purchaser "with notice or knowledge of a prior interest ... [such a purchaser] take[s] title subject to that prior interest." *United Matura Realty, Inc. v. Reade Industries, Inc.,* 155 A.D.2d at 661, 547 N.Y.S.2d at 893. Furthermore,

> although a title report may demonstrate a grantee's actual knowledge of the facts contained therein, it is not dispositive of the grantee's constructive or inquiry

---

**27.** This figure was arrived at by deducting the two federal tax liens, totaling $30,035.07, as well as approximately $6,000 remaining on the Columbia Banking assumed mortgage, from the $85,657.00 assessed value of the property. The latter figure was arrived at by subtracting the $4,271.00 that Mary and Kelly McCombs paid on

the Columbia Banking mortgage between January, 1983 and July 10, 1985, from the $10,469.29 amount they assumed in September, 1982. Because Robert McCombs' $53,000 loan to his daughters was used to pay off the Marine Midland Bank indebtedness, *see* Defendants' Post-Trial Brief at 9, this amount was not used.

knowledge about an earlier conveyance. A person must use ordinary thoughtfulness and make accessible inquiries. If he does not, and avoids the inquiry, he is chargeable with the knowledge which ordinary diligence would have elicited, and cannot be considered a *bona fide* purchaser.

*United States v. Orozco–Prada*, 636 F.Supp. at 1543. Robert McCombs, through his attorney, introduced no evidence to establish that he inquired as to the status of liens on the property, or that had such an inquiry been conducted, it would have shown no prior liens on the property. Even though the government tax liens would not have shown up on a title search because the Certificates of Assessment were filed after Ms. McCombs–Ellison transferred the property to her daughters on September 15, 1982, it is not dispositive as to the issue of his knowledge of the tax liens. *Id.* And because this was another intra-family transaction, between father and daughters, it is highly unlikely that he was in a state of total ignorance of the tax penalties assessed against his former wife, Ms. McCombs–Ellison. Although nothing was submitted on the issue of what type of relationship existed between Ms. McCombs–Ellison and Mr. McCombs, it is difficult to conceive that there was absolutely no communication between them, at least through their daughters. Based on the circumstances, I find that an inference can be drawn that Mr. McCombs did have knowledge of the liens and that the September 15, 1982 transfer from Ms. McCombs–Ellison to her daughters was done fraudulently for the purpose of avoiding her creditor, the United States Government.

■ Robert McCombs has thus failed to meet his burden that he was a *"bona fide* purchaser[ ] for valuable consideration and had neither actual nor constructive knowledge that the conveyance from [Ms. McCombs–Ellison to Mary and Kelly McCombs] was fraudulent." *United States v. Orozco–Prada*, 636 F.Supp. at 1542. Any claim he has "must be set aside in favor of the United States." *Id.*, 636 F.Supp. at 1543.

Furthermore, Mr. McCombs is not protected under 26 U.S.C. § 6323(b)(1) as a purchaser or holder of a security interest because he failed to sustain his burden of showing that he "did not have actual notice or knowledge of the existence of such [tax] lien[s]," *id.*, for the same reasons that he failed to show lack of knowledge of the fraudulent conveyance of September 15, 1982.

## G. The Property is to be Sold at a Judicial Sale Pursuant to 26 U.S.C. § 7403

Section 7403 of the Internal Revenue Code authorizes a federal district court to order a sale of property in which a delinquent taxpayer has an interest in order to satisfy that taxpayer's debt. A district court may do so even though an innocent third party also has an interest in the property, so long as the third party receives compensation.

*United States v. Bierbrauer*, 936 F.2d 373, 374 (8th Cir.1991). There are no innocent third parties in this proceeding.[28] Only the State of New York has a claim to any surplus monies from the sale in order to satisfy a tax warrant in the amount of $2,635.74 against Ms. McCombs–Ellison, which was filed in the Monroe County Clerk's Office on June 10, 1985. *United States v. Kocher*, 468 F.2d 503, 506 (2d Cir.1972), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973) (§ 7403(c) "literally provides for the sale of any property in which the delinquent taxpayer has any interest, with the proceeds to be distributed according to the interests of the parties").

■ In making this decision, the parties should be aware that the court does not "have unbridled discretion" when deciding whether or not to "go ahead with a forced sale authorized by § 7403...." *United States v. Rodgers*, 461 U.S. at 709, 103 S.Ct. at 2151. Although I am forced to exercise "the limited discretion accorded by § 7403 ... rigorously and sparingly, [I am to] keep[ ] in mind the government's paramount

28. Because there are no innocent third parties in this proceeding, the factors to be considered by a district court, when exercising its discretion pursuant to 26 U.S.C. § 7403 to decide whether to

order a sale, do not apply in this case. *See United States v. Rodgers*, 461 U.S. at 710–711, 103 S.Ct. at 2151–52.

interest in prompt and certain collection of delinquent taxes." *Id.,* 461 U.S. at 711, 103 S.Ct. at 2152. Furthermore, there are "virtually no circumstances ... in which it would be permissible to refuse to authorize a sale simply to protect the interests of the delinquent taxpayer ... herself." *Id.,* 461 U.S. at 710, 103 S.Ct. at 2151. Because this is a "case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof," 26 U.S.C. § 7403(a), I am exercising "the limited discretion accorded [me] by § 7403(c)," *United States v. Rodgers,* 461 U.S. at 711, 103 S.Ct. at 2152, and decree that the property located at 74 Meadow Creek Lane, Rochester, New York, be sold. The proceeds of sale are to be distributed as follows: first, to satisfy the tax liens of the United States government in the amount of $30,035.07, with interest thereon from the date of assessments,[29] and second, if there are any surplus monies remaining, to satisfy defendant State of New York's tax warrant.

### III. *Conclusion*

On the basis of the foregoing, the following constitutes the verdict and opinion of this court:

(1) Defendant Nancy McCombs–Ellison is liable, under 26 U.S.C. § 6672, for unpaid withholding taxes in the amount of $30,035.07.

(2) Defendant Nancy McCombs–Ellison did fraudulently convey the property located at 74 Meadow Creek Lane, Rochester, New York to defendants Mary and Kelly McCombs on September 15, 1982, which conveyance must be set aside.

(3) The United States government's liens for the unpaid withholding taxes are a lien on the property as of the dates of assessment.

(4) The interest of defendant Columbia Banking no longer exists; it lien has been fully satisfied.

(5) The United States government liens:

 (a) are now reduced to judgment; and

 (b) have priority over all other creditors' liens on the property.

(4) The United States government may foreclose its liens on the property at a judicial sale.

(5) Defendant State of New York may receive surplus monies, if any, from the sale, to satisfy its tax warrant against defendant Nancy McCombs–Ellison.

(6) The government is entitled to attorney's fees in this action.

(7) Defendants' motions for summary judgment and for dismissal of the complaint are denied.

SO ORDERED.

### ON REQUEST FOR ATTORNEYS' FEES

#### April 22, 1993.

In the verdict and opinion rendered on March 29, 1993, this court granted the government's request for attorneys' fees. On April 21, 1993, the government submitted a Declaration of Attorneys' Fees, in which it stated that it was due $15,137.95 in attorneys' fees for the time it spent prosecuting this action.

■■■ I have carefully reviewed the government's Declaration, paying particular attention to the amount of hours devoted by

---

**29.** "26 U.S.C. § 6601(e)(2)(A) imposes the interest on assessable penalties." *Bradley v. United States,* 936 F.2d 707, 708 (2d Cir.1991) (footnote omitted).

According to this section,

[i]nterest shall be imposed under subsection (a) in respect of any assessable penalty, ... only if such assessable penalty is not paid within 10 days from the date of notice and demand therefor, and in such case shall be imposed only for the period from the date of notice and demand to the date of payment.

26 U.S.C. § 6601(e)(2)(A). As noted previously, the notice and demand requirement does not

apply to penalties assessed under § 6672. *Jacobson v. Organized Crime and Racketeering Section of the United States Dept. of Justice,* 403 F.Supp. at 1336; *see supra* note 17. Even though I find that notice and demand for payment was made on October 5, 1981 and October 20, 1981, respectively, when Richard Prior of the Internal Revenue Service wrote to Ms. McCombs–Ellison, informing her of the delinquent taxes and of the possibility that she would be held personally liable for them, the Government asked for interest on the penalties only from the date of the assessments. *See* Government Exhibits 16 & 17; Complaint, at p. 6.

the government's attorneys to the litigation of this action. In so doing, I find that the number of hours the government spent in the prosecution of this action to be excessive and the bill outrageous. It appears that the government has got its pound of flesh and now wants the bone also. While deciding this case, it became evident that the type of proceeding involved in this case—a 100% penalty case—is not an uncommon action, and, in fact, is one that is routinely pursued and litigated by the government.

Therefore, it is hereby ordered that the government's request for attorneys' fees is denied, and that portion of the verdict and opinion granting the award of attorneys' fees to the government is hereby vacated.

SO ORDERED.

## DECISION and ORDER

### June 21, 1993.

Plaintiff moves to amend this court's order of April 22, 1993, which denied plaintiff's application for attorney's fees and vacated that portion of the verdict and opinion, dated March 29, 1993 (and amended March 30, 1993), granting plaintiff's request for attorney's fees. Defendants oppose the motion on various grounds.

### *Background*

■ A nonjury trial was held before me in this matter on March 19, 1992. Post-trial arguments were heard on September 14, 1992. I rendered my verdict and opinion on March 29, 1993 (amended March 30, 1993), finding for the government in all respects, and awarding it attorney's fees pursuant to N.Y. Debtor & Creditor Law § 276–a. The Clerk of the Court entered judgment on April 5, 1993, in accordance with the verdict and opinion. The government subsequently filed a Declaration in support of its request for attorney's fees, which detailed the amount of hours expended in its litigation of this case. After reviewing the declaration, I denied the government's request for attorney's fees in its entirety, and vacated that portion of the verdict and opinion which granted its request for attorney's fees. The grounds for my decision were as follows:

> [After] carefully reviewing the government's Declaration, paying particular attention to the amount of hours devoted by the government's attorneys to the litigation of the action, ... I f[ou]nd that the number of hours the government spent in the prosecution of this action to be excessive and the bill outrageous. It appears that the government has got its pound of flesh and now wants the bone also. While deciding this case, it became evident that the type of proceeding involved in this case—a 100% penalty case—is not an uncommon action, and, in fact, is one that is routinely pursued and litigated by the government.

Order, dated April 22, 1993, at 1. The government filed a motion to amend the April 22nd order, pursuant to Fed.R.Civ.P. 59(e), on May 7, 1993.[1] Plaintiffs Nancy McCombs–Ellison and Robert McCombs responded in opposition to the motion to amend on May 20, 1993; they also filed an appeal of the verdict and opinion with the Second Circuit on May 10, 1993. Kelly and Mary McCombs also appealed the verdict and opinion to the Second Circuit on June 4, 1993.

### *Discussion*

■ "The 'narrow aim' of Rule 59(e) is 'to mak[e] clear that the district court possesses the power' to rectify its own mistakes in the period immediately following entry of judgment." *Greene v. Town of Blooming Grove,* 935 F.2d 507, 512 (2d Cir.1991) (quoting *White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 450, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982)), *cert.*

---

1. Fed.R.Civ.P. 59(e) provides as follows:

 A motion to alter or amend the judgment shall be served not later than 10 days after the entry of judgment.

 I find that the government filed its motion to amend the April 22nd order, which modified the final judgment in the case, in a timely manner. Although the motion was not filed until May 7, 1993, 11 includable days after the entry of the order on April 22, 1993, the cover letter is dated May 5, 1993. By serving the motion by mail nine includable days after the order amending the judgment was entered, the government was "well within Rule 59(e)'s prescribed time period." *Harborside Refrigerated Services, Inc. v. Vogel,* 959 F.2d 368, 372 (2d Cir.1992).

denied, —— U.S. ——, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991). Furthermore, a "trial court's reversal of its initial judgment ... [is reviewed] only for abuse of discretion.... Phrased another way, unless ... the *second* opinion ... [is] clearly erroneous in its findings, the court's second judgment must be upheld." *National Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 125 (1st Cir.1990) (emphasis in original).

Ordinarily, "Rule 59(e)'s ten-day time limit presents no bar to ... [an] [attorney's] fee award." *Goodman v. Heublein, Inc.*, 682 F.2d 44, 48 (2d Cir.1982). But in this case, because plaintiff's motion "calls into question the correctness of a district court judgment[,] [it] is the functional equivalent of a Rule 59(e) motion, and should be treated as such." *Harborside Refrigerated Services, Inc. v. Vogel*, 959 F.2d 368, 372 (2d Cir.1992). *See Farkas v. Ellis*, 783 F.Supp. 830, 832 (S.D.N.Y.1992), *aff'd* 979 F.2d 845 (2d Cir. 1992) ("plaintiff's motion to alter or amend the judgment[ ] [is] essentially a motion for reargument [and] will be considered under Rule 59(e)"). Thus, in order to prevail under Fed.R.Civ.P. 59(e), the government "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986); *Bowers v. Andrew Weir Shipping, Ltd.*, 817 F.Supp. 4, 5 (S.D.N.Y.1993) (same); *Kalman v. Berlyn Corp.*, 706 F.Supp. 970, 974 (D.Mass.1989) (same); *Wallace v. Brown*, 485 F.Supp. 77, 78 (S.D.N.Y.1979) (same). Accordingly, "[a] motion to amend the judgment will be granted only if the movant presents matters or controlling decisions which the court overlooked that might have materially influenced its earlier decision." *In Design v. Lauren Knitwear Corp.*, 1992 WL 42911, at *1 (S.D.N.Y. Feb. 24, 1992).

The standard for granting a motion for reargument [pursuant to Fed.R.Civ.P. 59(e) ] is strict in order to preclude repetitive arguments on issues that have already been considered fully by the court. Such motions may be granted only where the court has overlooked matters or controlling decisions which might have materially influenced the earlier decision.

*Farkas v. Ellis*, 783 F.Supp. at 832–833. This standard is "strict in order to dissuade litigants from making repetitive arguments on issues that the court has already fully considered." *In Design v. Lauren Knitwear Corp.*, 1992 WL 42911, at *1.

With respect to the award of attorney's fees, the Second Circuit "recognize[s] the broad discretion a district court has in making this ultimate determination ..." *International Brotherhood of Teamsters, Joint Council 18 v. New York State Teamsters Council Health and Hospital Fund*, 903 F.2d 919, 923 (2d Cir.1990), *cert. denied*, 498 U.S. 898, 111 S.Ct. 251, 112 L.Ed.2d 210 (1990). Indeed it elaborated on this point in *In re: Bolar Pharmaceutical Co., Securities Litigation*, 966 F.2d 731 (2d Cir.1992), as follows:

[T]he scope of our appellate review of attorneys' fee awards is narrow. "Abuse of discretion" is one of the most deferential standards of review; it recognizes that the district court, which is intimately familiar with the nuances of the case, is in a far better position to make certain decisions than is an appellate court, which must work from a cold record. We have long recognized that [attorney] fee awards ... fall into this category.

*Id.* 966 F.2d at 732. *See also Samuels v. American Motors Sales Corp.*, 969 F.2d 573, 575 (7th Cir.1992) ("We will generally not reverse an award or denial of attorney's fees unless there is a showing the trial court abused its discretion.... What we require the trial court to do is exercise its discretion regarding an attorney's fee award in a reasonable manner"). Notwithstanding the fact that the exercise of this discretion "gives the district judge great leeway," *Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir.1979), *aff'd* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), "whichever way it exercises its discretion, a district court should make specific findings regarding the matter." *International Brotherhood of Teamsters, Joint Council 18 v. New York State Teamsters Council Health and Hospital Fund*, 903 F.2d at 924. *See also Mentor Insurance Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 521 (2d Cir.1993) (the court is required to make

"factual findings sufficient to uphold an award of attorneys fees"). Furthermore, this Circuit follows "the well settled general [American] rule ... that a prevailing party in federal litigation is not entitled to recover attorneys fees or litigation expenses." *Id.* 996 F.2d at 521; *Hirschfield v. Board of Elections,* 984 F.2d 35, 40 (2d Cir.1993) (American rule); *Gordon v. Heimann,* 715 F.2d 531, 539 (11th Cir.1983) (same). An exception to the American Rule exists where the losing party has acted in bad faith, *Gordon v. Heimann,* 715 F.2d at 539, an exception the government has not relied upon during the course of litigating this action.

Accordingly, a review of cases in which attorney fee awards have been reduced or denied is in order. In *Fase v. Seafarers Welfare & Pension Plan,* 589 F.2d 112 (2d Cir.1978), Judge Friendly held that the district court did not abuse its discretion in declining to award attorney's fees in an ERISA case, finding there to be "altogether sufficient support for the [district] court's decision not to award attorney's fees under ERISA [because] ... the attorney obtained no relief under that statute, ..." *Id.* 589 F.2d at 116. In *Gagne v. Maher,* 594 F.2d 336 (2d Cir.1979), *aff'd* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), the Second Circuit upheld the district court's 30% reduction of a fee award on the basis that 30% of the funding for plaintiff's counsel, the Legal Aid Society, came from the federal government. The court stated that "[a]lthough such a reduction is not mandatory and we do not suggest that it be routinely done, *see, Mid–Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34 (2d Cir.1978), the issue is committed to the sound discretion of the district court." *Id.* 594 F.2d at 345. Nor did the court find that "the district court ... commit[ted] error in disallowing one-half of the hours worked because 'the issues involved in the case were relatively simple and most attorneys would not have spent so many hours on the case.'" *Id.* (quoting district court opinion, *id.,* 455 F.Supp. 1344, 1349 (D.Conn.1978)). In so holding, the court noted that

> [i]f the fee claims are exorbitant or the time devoted to presenting them is unnecessarily high, the judge may refuse further

compensation or grant it sparingly. We leave these matters in the first instance to the district court.

*Id.* 594 F.2d at 344 (citation omitted). Similarly, in *Davidcraft Corp. v. Danu International, Inc.,* No. 90 Civ. 6578, 1992 WL 247035 (S.D.N.Y. Sept. 15, 1992), the plaintiffs moved pursuant to Fed.R.Civ.P. 59(e) to amend the judgment by awarding them punitive damages and attorney's fees. The court, in denying plaintiffs' motion, stated that it

> adhere[d] to its decision to deny an award of punitive damages and attorney's fees. Despite Davidcraft's protestations to the contrary, the court is persuaded that the compensatory damages that were awarded by the court will suffice to place Davidcraft back into its original position and to promote deterrence. Accordingly, the Rule 59(e) motion to amend the judgment by awarding punitive damages and attorney's fees is denied.

*Id.* 1992 WL 247035, at *2.

Other circuits similarly adhere to the standard of deference to the district court's decision regarding the award of attorney's fees. In *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500 (9th Cir.1986), the Ninth Circuit held that "the district court was not plainly wrong ... and ... did not abuse its discretion" when it denied a Rule 59(e) motion for attorneys' fees and costs based on its finding that the motion was "frivolous because it introduced nothing new ..." *Id.* 803 F.2d at 505. Nor was the district court in *Samuels v. American Motors Sales Corp.,* 969 F.2d 573 (7th Cir.1992), found to have abused its discretion when it reduced an attorney's fee award from the amount requested, $38,-149.75, to $11,137, based on its finding that, *inter alia,* the case was conducted in an "inefficient manner." *Id.* 969 F.2d at 574–75.

The government has "introduced nothing new" in its motion to amend the April 22nd judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d at 505. Nor has it "clearly establish[ed] either a manifest error of law or fact or ... present[ed] newly discovered evidence." *Federal Deposit Ins. Corp. v. Meyer,* 781 F.2d at 1268. Despite the attempts at settlement alleged in its papers in support

of the motion to amend, I do not find that the government has adequately demonstrated to this court how the hours spent on the case were not excessive. Again, I find that " 'the issues involved in the case were relatively simple and most attorneys would not have spent so many hours on the case,' " *Gagne v. Maher*, 594 F.2d at 345 (quoting district court opinion), and further that "the fee claims are exorbitant [and] the time devoted to presenting them is unnecessarily high, ..." *Id.* 594 F.2d at 344. I also find that the original judgment entered in the government's favor, allowing it to foreclose its lien upon the property, "suffice[s] to place [it] back into its original position and to promote deterrence." *Davidcraft Corp. v. Danu International, Inc.*, 1992 WL 247035, at *2. Furthermore, as stated by the Northern District of Illinois, when it denied the government's request for attorney's fees pursuant to Fed.R.Civ.P. 11, against a plaintiff who unsuccessfully sued the government pursuant to 26 U.S.C. § 6703 to recover a tax penalty assessed under 26 U.S.C. § 6702:

> [the] [d]efendant is in effect asking this court to punish plaintiff again ..., [and] that to accept defendant's position on these facts would mean that every time a person sues under § 6703 to recover a tax penalty assessed under § 6702 and loses, that person will automatically be assessed for the government's attorneys' fees. This court finds no evidence that Congress intended such a result.

*Davis v. United States*, 104 F.R.D. 509, 512 (N.D.Ill.1985).

■ Notwithstanding the "great leeway," *Gagne v. Maher*, 594 F.2d at 344, accorded the district court's exercise of its discretion in attorney's fee award decisions, and the substantial deference paid to the exercise of that discretion, the Second Circuit recently addressed the award of attorney's fees pursuant to N.Y. Debtor & Creditor Law § 276–a. In *Carey v. Crescenzi*, 923 F.2d 18 (2d Cir.1991), the court held that in fraudulent conveyance actions, attorney's fees are to be awarded pursuant to § 276–a only upon the court's *"explicit* finding of actual intent to defraud; imputed fraud does not satisfy § 276–a." *Id.* 923 F.2d at 21 (emphasis supplied). Specifically, "there should be a finding of [the fraudulent transferor's and transferees'] *actual knowledge* of the circumstances that render the[ ] conveyances fraudulent." *Id.* (emphasis supplied). The Second Circuit held that the district court's findings of actual intent to defraud were insufficient to support an award of attorney's fees against the fraudulent transferees pursuant to § 276–a because the findings were based on inferences derived from the evidence before the court. *Id.*[2] It further stated that "[a]lthough the constructive fraud established by th[e] record is sufficient to set aside the conveyance under § 273–a,[3] it is not sufficient to award attorneys' fees against [the fraudulent transferees]" *Id.*

■ On the authority of *Carey*, therefore, I am compelled to uphold my decision to vacate the attorney's fees awarded pursuant to § 276–a. In the verdict and opinion, I found that Ms. McCombs–Ellison failed to overcome the presumption of insolvency, which applied because she transferred the property to her daughters without fair consideration while indebted to the federal government for the amount of its tax liens. Because of her failure to overcome the presumption of insolvency, the transfer was

**2.** The district court inferred actual intent to defraud from the following:
 (1) the transfers of property were intrafamily;
 (2) the deeds recited a nominal consideration;
 (3) there was deposition testimony that no consideration was paid; and (4) the debtor ... "knew of the potential claim against him when he transferred the property."
*Carey v. Crescenzi*, 923 F.2d at 21 (quoting district court opinion).

**3.** The elements for finding a conveyance fraudulent under N.Y. Debtor & Creditor Law § 273–a are the same as those for finding a conveyance

fraudulent pursuant to § 273, the statute upon which the defendants in this case were found to have fraudulently conveyed the property in question. *See generally* Verdict and Opinion, dated March 29, 1993. Both provisions require that a conveyance be made without fair consideration and "without regard to the actual intent" of the insolvent or defendant, respectively. N.Y. Debtor & Creditor Law §§ 273 and 273–a. *See Atlanta Shipping Corp., Inc. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir.1987) ("An essential element of a claim pursuant to DCL §§ 273 [and] 273–a ... is lack of fair consideration").

fraudulent pursuant to N.Y. Debtor & Creditor Law § 273. *See* Verdict and Opinion, dated March 29, 1993, at Part III–E–1. I next inferred from the circumstantial evidence presented by the government that Ms. McCombs–Ellison possessed "actual intent" to defraud the government via this conveyance, as that term is construed under N.Y. Debtor & Creditor Law § 276. *See id.* at Part III–E–2. These inferences, however, cannot be said to be the "*explicit* finding[s] of actual intent to defraud" required by *Carey v. Crescenzi*, 923 F.2d at 21 (emphasis supplied). Rather, the inferences were used as the basis upon which to impute Ms. McCombs–Ellison's actual fraudulent intent. And *Carey* makes clear that "imputed fraud does not satisfy § 276–a." *Id.* 923 F.2d at 21. Thus, just as the *Carey* district court's inferential findings of actual intent to defraud were insufficient to support an award of attorney's fees pursuant to § 276–a, so too is the circumstantial and inferential evidence this court relied on when finding actual intent to defraud pursuant to N.Y. Debtor & Creditor Law § 276. Accordingly, "[a]lthough the constructive fraud established by th[e] record is sufficient to set aside the conveyance under § 273–a, it is not sufficient to award attorneys' fees against" the defendants. *Id.* 923 F.2d at 21. *See also Federal Deposit Insurance Co. v. Malin*, 802 F.2d 12, 20 (2d Cir.1986) (the Second Circuit reversed district court's award of attorneys' fees pursuant to § 276–a when it found no actual fraudulent intent); *Remo Drug Corp. v. Sheik*, No. CV–89–0508, 1990 WL 82820, at *2 (E.D.N.Y. June 12, 1990) ("Since there is no finding of actual fraud, however, plaintiff may not recover attorney's fees [under] New York Debtor–Creditor Law § 276–a"); *Orbach v. Pappa*, 482 F.Supp. 117, 121 (S.D.N.Y.1979) ("the lack of actual fraudulent intent ... preclude[d] recovery of" reasonable attorney's fees pursuant to N.Y. Debtor & Creditor Law § 276–a) (citations omitted).

### Conclusion

"In sum, the Court adheres to its previous opinion [dated April 22, 1993], in its entirety, concluding that plaintiff[ ] ha[s] failed to establish that the Court has overlooked any matters or controlling decisions which might have influenced its decision [of April 22, 1993]." *Farkas v. Ellis*, 783 F.Supp. at 834. The government's motion to alter or amend this court's order of April 22, 1993, which 1) denied the government's request for attorney's fees; and 2) vacated the attorney's fee award portion of the March 29, 1993 verdict and opinion granting the government attorney's fees pursuant to N.Y. Debtor & Creditor Law § 276–a, is denied.

SO ORDERED.